1  JOE SIBLEY (pro hac vice to be filed)
2  *sibley@camarasibley.com*
   **CAMARA & SIBLEY LLP**
3  1108 Lavaca St., Suite 110263
   Austin, TX 78701
4  Telephone: (713) 966-6789
   Fax: (713) 583-1131
5
6  JUSTIN O. WALKER (SBN 275633)
   *justin@walkerlawsd.com*
7  LORRIE A. WALKER (SBN 272637)
   *lorrie@walkerlawsd.com*
8  JARED A. VELIZ (SBN 276191)
   *jared@walkerlawsd.com*
9  **WALKER LAW, PC**
   2247 San Diego Ave., Suite 136
10 San Diego, CA 92101
   Telephone: (619) 839-9978
11
   Attorneys for Plaintiff
12
13              **UNITED STATES DISTRICT COURT**
14              **CENTRAL DISTRICT OF CALIFORNIA**
15
16 INFLUENCES, INC., a Delaware          **CASE NO.:**
   corporation
17                                        **COMPLAINT FOR:**
18              Plaintiff;,              1. **INTENTIONAL INTERFERENCE
                                            WITH CONTRACTUAL
19 v.                                       RELATIONS**
                                         2. **INTENTIONAL
20 UNITED TALENT AGENCY, INC.,              INTERFERENCES WITH
   a California corporation; and DOES 1     PROSPECTIVE ECONOMIC
21 through 50, inclusive,                   RELATIONS**
                                         3. **NEGLIGENT INTERFERENCE
22              Defendants.                 WITH PROSPECTIVE
                                            ECONOMIC RELATIONS**
23                                       4. **UNLAWFUL, UNFAIR, AND/OR
                                            FRAUDULENT BUSINESS
24                                          PRACTICES [*Cal. Bus. & Prof.
                                            Code § 17200 et seq.*]**
25
26
27              **JURY TRIAL DEMANDED**
28
                                    1
        **COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Plaintiff INFLUENCES, INC. ("INFLUENCES" or "PLAINTIFF") alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.  There is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

2.      This Court has personal jurisdiction of Defendant and venue is proper under 28 U.S.C. § 1391.  Defendant UNITED TALENT AGENCY, INC. ("UTA" or "Defendant") is a California corporation that is headquartered in Los Angeles County, California and, as such, UTA is a resident of this district.  It may be served through its registered agent, ANDREW THAU, 9336 CIVIC CENTER DRIVE, BEVERLY HILLS, CA 90210.

## NATURE OF THE ACTION

3.      This is an action arising under California state tort law for intentional and negligent interference by Defendant, one of the nation's foremost talent agencies, as to the contracts and business relationships of Plaintiff, a company founded by a female minority immigrant attempting to break into the cutthroat world of the entertainment industry by pioneering the intersection of the influencing phenomenon and the TikTok social medium.

## PARTIES

4.      Plaintiff INFLUENCES is a Delaware corporation with its principal place of business in Las Vegas, Nevada.  It may be contacted through its counsel of record in this action.

5.      Defendant UTA is a California corporation with a principal place of business located at 9336 Civic Center Drive, Beverly Hills, CA 90210.

6.      The tortious acts and omissions alleged herein were performed by officers, directors, and/or managing agents of Defendant UTA, as set forth in California Civil Code 3294, including, but not limited to, UTA employees Greg

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1  Goodfried, Brent (then Digital Co-Head of UTA) Weinstein (Chief Innovation
2  Officer of UTA), and Austin Mayster (then Talent Agent), among others
3  anticipated to be identified through discovery in this matter.

4      7.      Defendant committed the acts alleged herein maliciously, fraudulently,
5  and oppressively, and with the wrongful intention of injuring Plaintiff, and acted
6  with an improper and evil motive amounting to malice or despicable conduct.
7  Alternatively, Defendant's wrongful conduct was carried out with a conscious
8  disregard for Plaintiff's rights.

9      8.      Defendant's conduct warrants the assessment of punitive damages in
10 an amount sufficient to punish Defendant and deter others from engaging in similar
11 conduct.

12                              **FACTS**

13 **A. Plaintiff's Background.**

14     9.      Ariadna Jacob ("Jacob"), Plaintiff Influence's founder, was born in
15 Mexico City, Mexico.  She immigrated to the United States as a small child, having
16 lost her father at a young age.

17     10.     In 2018 she became the founder and CEO of Influences
18 (www.influences.com), which was a leading online creator management and
19 influencer marketing company.  Jacob was a pioneer in the now multi-billion-dollar
20 influencer industry on the TikTok ("TikTok") social media application.

21     11.     Ms. Jacob, through Influences and another of her companies, Creator
22 Edge, Inc. ("Creator Edge") has managed, counseled, and guided dozens of TikTok
23 influencers, including some of the most recognizable names and faces in the
24 industry.  Indeed, at different points in time, Influences had a roster that boasted
25 over 85 TikTok superstars, including five of the seven creators listed on the Forbes
26 top earning TikTok creator's list for 2020.

27
28

12.     Jacob/Influences was perfectly positioned to understand the emerging medium of TikTok.  Their understanding of computer coding, SEO, and social media gave their insight into the platform's more technical details, while their background in traditional marketing and branding, including their acclaimed work for household brand and advertising agency names such as L'Oréal, GoDaddy, Universal Music Group, the LA Chargers, MasterCard, Lids, and Vayner Media, provided their knowledge of (and relationships with) companies with substantial marketing budgets – budgets that increasingly reserved substantial funds for online social media spends.

13.     Social media in general has never been bigger, more profitable, and more omnipresent and it continues to grow.  Influences/Creator Edge[1] had contractual/economic relationships with influencers who would go on to become some of the biggest in the world (and had, in fact, helped make them famous) as of January 2020 when, as discussed below, they were tortiously poached by UTA.

**B. Plaintiff Collects A Roster Of Talent.**

14.     Seeing the enormous potential for TikTok influencing, Influences, through Jacob's connections, skills, and prowess, discovered some of the most well-known influencers in the world.

15.     Influences became a representative to Charli D'Amelio ("Charli") and Dixie D'Amelio ("Dixie" and, collectively, the "D'Amelios") on or about November 2019, when they were not nationally prominent.  The D'Amelios even listed Plaintiff as their point of contact on their social media accounts and had email addresses using Plaintiff's domain.  Influences and the D'Amelios had an agreement whereby Influences would pay the D'Amelios 90% of all of Influences' business wherein their likeness was utilized.  Influences and the D'Amelios performed under this agreement and made money together.

---

[1] Influences has acquired all contractual rights from Creator Edge and is thus, assignee and/or successor in interest to those rights.  To the extent that any of the contracts/business relationships described herein were originally between influencers and Creator Edge, Influences now hold all right, title, and interest to those contractual rights and/or claims.

4

16.   Also, in September 2019, Influences helped spawn the career of Brittany Tomlinson ("Tomlinson").   Influences signed an agreement with Tomlinson wherein they agreed Tomlinson would be paid 80% of all of Influences' business wherein her likeness was utilized.   The parties performed under their agreement and made money together.

17.   Influences also had an agreement with Bang Energy wherein it agreed to provide influencing content from Sebastian Bails ("Bails") wherein Influences agreed to pay Bails 85% of a $240,000.00 fee.

18.   In 2020, Influences also had an agreement with Sofia Wylie ("Wylie").   Influences had an agreement whereby Influences would pay Wylie 90% of all of Influences' business wherein her likeness was utilized.

## C.   UTA Poaches Influences' Clients.

19.   No sooner than Influences entered into contractual/business relationships with these influencers, UTA began a cutthroat campaign to poach them from Influences using unscrupulous methods.

20.   Plaintiff would ultimately learn that UTA's Greg Goodfried ("Goodfried") flew out to meet with the D'Amelios in late December 2019/early January 2020 after the D'Amelios' relationship with Plaintiff began.

21.   On January 13, 2020, the D'Amelios informed Influences that they were terminating their relationship with Influences.   Immediately thereafter, the D'Amelios signed with UTA.  In the last two years, after leaving Influences, Charli has made $23,000,000.00 and Dixie has made $14,000,000.00.   Under their agreement, Influences would have made $3,700,000.00.

22.   Then, while listening to a call between Brittany Tomlinson and UTA's Brent Weinstein ("Weinstein") Jacob heard Weinstein disparage Jacob and Influences and tell Tomlinson to leave her relationships with Influences and that

UTA would "get her out of her contract" with Influences.  Weinstein impugned Jacob/Influences' integrity and competency.  Tomlinson would later text Jacob and tell her that Weinstein was being "pushy" with her and that she did not trust him. Ultimately, however, UTA's coercive conduct successfully induced Tomlinson to break her management agreement with Influences.  In the last two years, Tomlinson is believed to have made $3,000,000.00 after leaving Influences.   Under their agreement, Influences would have made $600,000.00.

23.   Austin Mayster ("Mayster") of UTA knew about and actively worked to interfere with Influences' agreement with Bails.  Mayster first convinced Bails to require Influences to increase his percentage to 90% from 85%.  After Influences reluctantly agreed to the increase, Bails ultimately succumbed to UTA's undue influence and breached his agreement with Influences and signed with UTA.  Bails then provided the content for Bang Energy (the engagement Influences set up) but Influences never received the agreed payment of $36,000.00 out of the $240,000.00 he received.

24.   Wylie would also leave Influences less than a month after entering into an agreement with Influences after UTA got involved in "advising" her regarding her relationship with Plaintiff.

## FIRST CAUSE OF ACTION
### (Intentional Interference With Contractual Relations)

25.   Plaintiff repeats and re-alleges each and every foregoing and subsequent allegation in this Complaint as though fully set forth herein, and further alleges as follows.

26.   Plaintiff can demonstrate intentional interference with contractual relations if it can show: (1) the existence of a valid contract or other economic relationship between Plaintiff and a third party; (2) Defendant's knowledge of that relationship; (3) intentional acts on the part of the Defendant designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption

of the contractual relationship; and (5) resulting damages. *Quelimane Co. Inc. v. Stewart Title Co.*, 19 Cal.4th 26, 55, 77 Cal. Rptr. 2d 709, 960 P.2d 513 (1998). "Because interference with an existing contract receives greater solicitude than does interference with prospective economic advantage, it is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself." *Id.* (citations omitted). "The tort of intentional interference with performance of a contract does not require that the actor's primary purpose be disruption of the contract." *Id.*

27.    Here, as discussed above, Plaintiff had valid contracts and/or ongoing economic relationships with Charli, Dixie, Tomlinson, and Bails. Defendant either admitted to or was specifically informed of the contracts/economic relationships with Tomlinson and Bails. Based on this and the facts discussed above, there is a reasonable inference that Defendant was likewise aware of Plaintiff's contracts/economic relationships with the D'Amelios.

28.    Plaintiff is aware that Defendant specifically made false and disparaging representations regarding Plaintiff to Tomlinson and Bails wherein they were specifically encouraged/induced to terminate/disrupt their contracts/economic relationships with Plaintiff. Based on this and the facts discussed above, there is a reasonable inference that Defendant likewise made disparaging representations regarding Plaintiff to the D'Amelios wherein they were specifically encouraged/induced to terminate/disrupt their contracts/economic relationships with Plaintiff. This inference is further buttressed by the fact that the termination/breach of the contracts/economic relationships with Plaintiff occurred shortly after meetings/communications between Defendant and Plaintiff. Finally, the fact that these influencers ultimately signed with UTA gives rise to this inference.

29.    As Plaintiff has detailed herein, all of the contracts/economic relationships with the influencers described above were, in fact, breached and/or terminated as a result of Defendant's conduct.

30.    These breaches/terminations caused by Defendant's interference caused the following specific damages to Plaintiff:

i.    Charli:  $2,300,000.00

ii.    Dixie:  $1,400,000.00

iii.    Tomlinson:  $600,000.00.

iv.    Bails:  $36,000.00.

31.    But for the above-referenced interference by Defendant, Plaintiff would have realized these amounts because a significant amount of the revenue deals directed at the above-referenced influencers were "inbound", meaning that that the business was sent directly to the influencer as a result of the influencer's public persona becoming more valuable.  As discussed above, Plaintiff, as manager of these influencers, helped these influencer's increase the value of their brand and thus, the likelihood of these "inbound" deals coming in.  Essentially, Plaintiff was instrumental in creating the influencers' brands (and thus the lucrative inbound deals) only to have them tortiously plucked away by Defendant once the fruits of Plaintiff's efforts were ready to harvest.

## SECOND CAUSE OF ACTION

### (Intentional Interference With Prospective Economic Relations)

32.    Plaintiff repeats and re-alleges each and every foregoing and subsequent allegation in this Complaint as though fully set forth herein, and further alleges as follows.

33.    Plaintiff can show intentional interference with prospective economic relations if they can show: (1) an economic relationship between Plaintiff and some third party, with the probability of future economic benefit to the Plaintiff; (2) the Defendant's knowledge of the relationship; (3) intentional acts on the part of the

8

1   defendant designed to disrupt the relationship; (4) actual disruption of the
2   relationship; and (5) economic harm to Plaintiff proximately caused by the acts of
3   the Defendant. *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47
4   Cal.App.4th 464, 475 [54 Cal.Rptr.2d 888].

5      34.    Here, as discussed above, Plaintiff had valid contracts and/or ongoing
6   economic relationships with Charli, Dixie, Tomlinson, and Bails. Defendant either
7   admitted to or was specifically informed of the contracts/economic relationships
8   with Tomlinson and Bails. Based on this and the facts discussed above, there is a
9   reasonable inference that Defendant was likewise aware of Plaintiff's
10  contracts/economic relationships with the D'Amelios.

11     35.    Plaintiff is aware that Defendant specifically made false and
12  disparaging representations regarding Plaintiff to Tomlinson and Bails wherein
13  they were specifically encouraged/induced to terminate/disrupt their
14  contracts/economic relationships with Plaintiff. Based on this and the facts
15  discussed above, there is a reasonable inference that Defendant likewise made
16  disparaging representations regarding Plaintiff to the D'Amelios wherein they were
17  specifically encouraged/induced to terminate/disrupt their contracts/economic
18  relationships with Plaintiff. This inference is further buttressed by the fact that the
19  termination/breach of the contracts/economic relationships with Plaintiff occurred
20  shortly after meetings/communications between Defendant and Plaintiff. Finally,
21  the fact that these influencers ultimately signed with UTA gives rise to this
22  inference.

23     36.    As Plaintiff has detailed herein, all of the contracts/economic
24  relationships with the influencers described above were, in fact, breached and/or
25  terminated as a result of Defendant's conduct.

26
27
28

37.     These breaches/terminations caused by Defendant's interference caused the following specific damages to Plaintiff:

i.      Charli:  $2,300,000.00

ii.     Dixie:  $1,400,000.00

iii.    Tomlinson:  $600,000.00.

iv.     Bails: $36,000.00.

38.     But for the above-referenced interference by Defendant, Plaintiff would have realized these amounts because a significant amount of the revenue deals directed at the above-referenced influencers were "inbound", meaning that that the business was sent directly to the influencer as a result of the influencer's public persona becoming more valuable.  As discussed above, Plaintiff, as manager of these influencers, helped these influencer's increase the value of their brand and thus, the likelihood of these "inbound" deals coming in.  Essentially, Plaintiff was instrumental in creating the influencers' brands (and thus the lucrative inbound deals) only to have them tortiously plucked away by Defendant once the fruits of Plaintiff's efforts were ready to harvest.

## **THIRD CAUSE OF ACTION**

### **(Negligent Interference With Prospective Economic Relations)**

39.     Plaintiff repeats and re-alleges each and every foregoing and subsequent allegation in this Complaint as though fully set forth herein, and further alleges as follows.

40.     Plaintiff can show a negligent interference with prospective business advantage if it can show:  (1) an economic relationship existed between Plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to Plaintiff; (2) Defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause Plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the

1  Defendant was negligent; and (4) such negligence caused damage to Plaintiff in
2  that the relationship was actually interfered with or disrupted and Plaintiff lost in
3  whole or in part the economic benefits or advantage reasonably expected from the
4  relationship. *N. Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764, 786, 69
5  Cal. Rptr. 2d 466 (1997).
6      41.    Here, as discussed above, Plaintiff had valid contracts and/or ongoing
7  economic relationships with Charli, Dixie, Tomlinson, and Bails.  Defendant either
8  admitted to or was specifically informed of the contracts/economic relationships
9  with Tomlinson and Bails.  Based on this and the facts discussed above, there is a
10  reasonable inference that Defendant was likewise aware of Plaintiff's
11  contracts/economic relationships with the D'Amelios.  This created a duty on
12  behalf of Defendant to exercise due care in its communications with these
13  influencers so as not to interfere with these relationships and/or cause Plaintiff to
14  lose the economic benefits of the relationship.  Defendant knew, or should have
15  known, of this duty and the duty to act with due care in its communications with
16  the influencers so as not to cause harm to Plaintiff and its future economic benefits
17  from its economic relationships with the influencers.
18      42.    Plaintiff is aware that Defendant specifically made false and
19  disparaging representations regarding Plaintiff to Tomlinson and Bails wherein
20  they were specifically encouraged/induced to terminate/disrupt their
21  contracts/economic relationships with Plaintiff.  Based on this and the facts
22  discussed above, there is a reasonable inference that Defendant likewise made
23  disparaging representations regarding Plaintiff to the D'Amelios wherein they were
24  specifically encouraged/induced to terminate/disrupt their contracts/economic
25  relationships with Plaintiff.  This inference is further buttressed by the fact that the
26  termination/breach of the contracts/economic relationships with Plaintiff occurred
27  shortly after meetings/communications between Defendant and Plaintiff.  Finally,
28  the fact that these influencers ultimately signed with UTA gives rise to this

inference.    These  actions,  at  minimum,  constitute  negligence  on  behalf  of Defendant.

43.    As  Plaintiff  has  detailed  herein,  all  of  the  contracts/economic relationships with the influencers described above were, in fact, breached and/or terminated as a result of Defendant's conduct.

44.    These  breaches/terminations  caused  by  Defendant's  interference caused the following specific damages to Plaintiff:

i.    Charli:  $2,300,000.00

ii.    Dixie:  $1,400,000.00

iii.    Tomlinson:  $600,000.00.

iv.    Bails:  $36,000.00.

45.    But  for  the  above-referenced  interference  by  Defendant,  Plaintiff would  have  realized  these  amounts  because  a  significant  amount  of  the  revenue deals directed at the above-referenced influencers were "inbound", meaning that that the business was sent directly to the influencer as a result of the influencer's public persona becoming more valuable.  As discussed above, Plaintiff, as manager of these influencers, helped these influencer's increase the value of their brand and thus, the likelihood of these "inbound" deals coming in.  Essentially, Plaintiff was instrumental  in  creating  the  influencers'  brands  (and  thus  the  lucrative  inbound deals) only to have them tortiously plucked away by Defendant once the fruits of Plaintiff's efforts were ready to harvest.

## FOURTH CAUSE OF ACTION

## UNLAWFUL, UNFAIR, AND/OR FRAUDULENT BUSINESS PRACTICES

### [*Cal. Bus. & Prof. Code § 17200 et seq.*]

46.    Plaintiff  repeats  and  re-alleges  each  and  every  foregoing  and subsequent allegation in this Complaint as though fully set forth herein, and further alleges as follows.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

47.     California Business & Professions Code section 17200 *et seq*. prohibits the engagement of any business acts or practices constituting unfair competition. Section 17200 defines "unfair competition" to mean and include "…any unlawful, unfair or fraudulent business act or practice."

48.     Plaintiff is informed and believes and, on that basis, alleges that all relevant times, Defendant was engaged in a scheme to operate in violation of law and to abuse and oppress the Plaintiff.  This scheme of operation is outlined above with respect to Defendant's interference with Plaintiff's' contract and/or economic relationships.

49.     As a direct and proximate result of Defendant's unlawful business practice(s), Plaintiff has suffered an injury in fact and was deprived of money or property to which it has a valid and cognizable claim.

50.     These damages to Plaintiff caused by Defendant's unlawful business practice(s) are as follows:

v.      Charli:  $2,300,000.00

vi.     Dixie:  $1,400,000.00

vii.    Tomlinson:  $600,000.00

viii.   Bails:  $36,000.00

51.     But for the above-referenced unlawful business practice(s) by Defendant, Plaintiff would have realized these amounts because a significant amount of the revenue deals directed at the above-referenced influencers were "inbound", meaning that that the business was sent directly to the influencer as a result of the influencer's public persona becoming more valuable.  As discussed above, Plaintiff, as manager of these influencers, helped these influencer's increase the value of their brand and thus, the likelihood of these "inbound" deals coming in. Essentially, Plaintiff was instrumental in creating the influencers' brands (and thus the lucrative inbound deals) only to have them tortiously plucked away by Defendant once the fruits of Plaintiff's efforts were ready to harvest.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

52.    In addition to all other damages properly recoverable, Plaintiff is entitled to all restitution damages arising from Defendant's unlawful and/or unfair business acts or practices, in an amount to be established according to proof, calculated by all profits that Defendant has realized from Charli, Dixie, Tomlinson, and Bails since their relationship with Plaintiff was severed due to Defendant's unlawful business practice(s).

## **PRAYER FOR RELIEF**

53.    Plaintiff prays for actual, compensatory, and consequential damages;

54.    Plaintiff prays for restitution of ill-gotten gains from Defendant;

55.    Punitive damages in an amount necessary to make an example of and to punish defendants, and to deter future similar conduct;

56.    Pre and Post Judgment Interest;

57.    Costs; and

58.    All other relief that Plaintiff shows it is entitled at law or equity.

Dated:                                          **WALKER LAW, PC**

                    By:    _____*/s/ Lorrie A. Walker*_____

                           Justin O. Walker
                           Lorrie A. Walker
                           Jared A. Veliz
                           Attorneys for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff INFLUENCES, INC. hereby requests trial by jury for all causes of action and forms of relief requested.


Dated:                                   **WALKER LAW, PC**



                              By:      _/s/ Lorrie A. Walker_

                                    Lorrie A. Walker
                                    Justin O. Walker
                                    Jared A. Veliz
                                    Attorneys for Plaintiff

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**